MARY L. P. ABNEY *vs.* FLORENCE A. V. TWOMBLY.

JUNE 13, 1916.

PRESENT:   Johnson, C. J., Parkhurst, Sweetland, Vincent, and Baker, JJ.

(1) *Easements.*

Grantor conveyed a tract of land the westerly boundary beginning on the north on the line of a third person at a point "two feet easterly of the east line of the carriageway of the grantor," "with the free right of passage to (the tract) out to X Avenue with carriages, teams and otherwise at any and all times." The tract was bounded westerly "on the end of a continuation of X Avenue and fifty feet on land of grantor; the tract was one hundred feet wide, thereby necessarily bounding fifty feet on the end of the continuation of X Avenue."

*Held,* that the grant expressly recognized the fact that there was a "carriageway of the grantor" at this point coming in easterly over the north portion of grantor's land and turning southerly two feet west of grantee's line and running down into the other land of grantor, and was plain evidence of the intention of grantor to retain the use of such carriageway on his own land and express notice to grantee of the existence of such carriageway and of grantor's intention to retain and use it since there was nothing in the deed to show that he intended to surrender it.

*Held,* further, that it was the intent of grantor that the lines of X Avenue should be extended easterly of the width of fifty feet so as to reach the tract conveyed to grantee and furnish the space within which both the way conveyed to grantee, and the carriageway of grantor should run and the language of the deed implied a covenant to this effect and estopped grantor and his grantees and successors in title from afterwards denying that there was such a street or way.

*Held,* further, that grantor did not convey the fee in the way.

*Held,* further, that the boundary "westerly on the end of a continuation of X Avenue" could not be construed to have conveyed to grantee any interest by way of fee in the soil of the continuation, since a conveyance of land

bounded on "the end of" a way conveys no more than an implied right to use the way as appurtenant to the land granted, and in the case at bar, there was no room for implication of a right of way because there was an express grant of such a right of way. The language of the description therefore simply defined the *locus* within which this right of way was to be exercised as being over this continuation of X Avenue, wherein grantor was using his carriageway, the result being that the fee in the "continuation" was reserved by grantor and that he also retained his "carriageway" over the same subject only to the right of passage in grantee.

*Held,* further, that the words of the grant of the right of way conveyed the right to an unobstructed right of way, but by the retention of the right by grantor to use the carriageway such use would not be an obstruction unless grantor made it so by such use as would substantially interfere with the grantee's use.

(*2*)  *Deeds.  Ambiguity.  Parol Evidence.*

Where a deed is not ambiguous on its face it is to be construed without reference to any prior understandings or promises on the part of grantor or his agent and parol evidence as to such matters is inadmissible.

(*3*)  *Easements.  Dominant and Servient tenements.*

In the case of a way, the owner of the servient estate may use the land over which it passes in any manner which does not materially impair or unreasonably interfere with its use as a way. He may himself use it as a way or permit others to do so, unless the rights of the owner of the easement are exclusive.

(*4*)  *Easements.  Extent of Rights of Dominant and Servient Tenants.*

Evidence as to the interference with the use of the way by both dominant and servient estates considered and relief granted in various respects.

BILL IN EQUITY.  Heard on certification under General Laws, cap. 289, § 35.

PARKHURST, J.  This is a bill in equity brought by the complainant who owns an estate in the city of Newport, Rhode Island, and has a right of way appurtenant thereto, to enjoin the respondent, who is the owner of the adjoining estate, from interfering with and obstructing such right of way. The bill was filed in the Superior Court for Newport County, and after answer, which also included allegations in the nature of a cross-bill, the case being at issue, and having been referred to a master to take testimony, thereafter the master reported the testimony to the court; and thereupon the cause being brought on to be heard for final decree, was

certified to this court for determination under the provisions of Chap. 289, § 35 of the General Laws (1909).

The bill sets forth the titles of the parties as having been derived from William Beach Lawrence, as the common ancestor in title, who was on and prior to November 28, 1876, the owner of all the land of the complainant and of the respondent, said land being situate between Ochre Point Avenue and the ocean at and near Ochre Point, so-called, in the city of Newport.

It is undisputed that as alleged in the bill, said Lawrence, by deed dated November 28, 1876, conveyed to Alice Key Pendleton, the wife of George H. Pendleton of Cincinnati, Ohio, a certain tract of land which was the northeast corner of said Lawrence's farm at Ochre Point, with a right of way, bounded and described as follows: "All of that lot of land, in the Fifth Ward of the city of Newport, adjoining the sea and lands of Mary Stuart Kernochan, bounded northerly on the lands of the said Mary S. Kernochan, there measuring about three hundred and ninety (390) feet, to a point two feet easterly of the east line of the carriage way of the grantor, westerly on the end of a continuation of Le Roy Avenue and fifty feet on lands of the grantor; then easterly in a line parallel with and one hundred feet distant from the southerly line of the lands of the said Kernochan to the sea, bounding the said premises southerly on lands of the grantor, and there measuring about three hundred and ninety feet to the sea, said granted premises are bounded easterly by the sea, and there measure one hundred (100) feet, and contain thirty nine thousand square feet of land, with the free right of passage to the same out to Le Roy Avenue, with carriages, teams and otherwise at any and at all times.

"To have and to hold the granted premises, with all the privileges and appurtenances thereto belonging, to the said Alice Key Pendleton and her heirs and assigns, to their own use and behoof forever."

The usual covenants of warranty follow.

It further appears in the bill, and is not disputed that said Lawrence, by deed dated February 28, 1877, conveyed to said Alice Key Pendleton a strip of land ten feet in width lying next southerly of the south line of the land above described; and that said Lawrence remained the owner of the balance of said land indicated as the southerly and westerly boundaries of the land above described and conveyed until his death in the year 1881; that by deed dated November 3, 1881, the executors and trustees under said Lawrence's will conveyed to Catherine L. Wolfe the said tract of land lying southerly and westerly of said Pendleton land, bounded "easterly on the ocean from Shepard Avenue to land of Pendleton, then northerly, four hundred feet on land of Pendleton, then easterly again seventy feet on land of Pendleton, then northerly again three hundred and eighty-two feet and eight inches on a lane or road about forty feet wide running from Ochre Point Avenue to land of Pendleton . . . and together also with all the right, title and interest of said testator at the time of his decease, in and to the said lane or road, leading from Ochre Point Avenue to land of Pendleton."

Catherine L. Wolfe having died in 1887 devised this same land to Louis L. Lorillard; said Lorillard conveyed the same to Hamilton McKay Twombly by deed dated March 21, 1896, using the same description as above set forth in the deed to Catherine L. Wolfe; the said Twombly died in 1909, and by his will devised the estate purchased from said Lorillard to his wife, the defendant, in this suit.

Mrs. Alice K. Pendleton died intestate May 20, 1886, and the estate now belonging to the complainant passed by inheritance to the complainant, her brother, Francis K. Pendleton, and her sister, Jane Frances Pendleton, subject to the tenancy by the curtesy of her father, George H. Pendleton, who survived his wife until November 24, 1889, when he died intestate. The three children of the said George H. Pendleton continued to own the said estate, now owned by the complainant, as tenants in common, until the year 1908,

when the complainant purchased the interests of her brother and sister and became and now is the sole owner of the property by deeds dated respectively April 27, 1908, and May 7, 1908. The description of the property so purchased from her brother and sister by the complainant by said deeds (so far as essential) is as follows: "The one undivided third part of all that certain lot of land in the fifth ward of the city of Newport, Rhode Island, adjoining the sea and lands formerly owned by Mary Stuart Kernochan, with all the buildings and improvements thereon and the contents of said buildings and improvements, bounded northerly on the lands formerly owned by said Mary Stuart Kernochan there measuring about three hundred and ninety feet from the sea to a point two feet easterly of the east line of a certain carriageway formerly belonging to William Beach Lawrence, westerly fifty feet on the end of a continuation of Le Roy Avenue and fifty feet on the lands formerly owned by William Beach Lawrence, thence by a line running easterly and parallel with, and one hundred feet distant from, the southerly line of the lands formerly owned by the said Mary Stuart Kernochan to the sea, bounding the said premises southerly on the lands formerly owned by William Beach Lawrence and there measuring about three hundred and ninety feet to the sea, and said premises are bounded easterly by the sea and there measure one hundred feet, and contain thirty-nine thousand square feet of land, with the free right of passage to the same out of LeRoy Avenue, with carriages, teams and otherwise at any and all times."   .   .   .

The complainant claims in her bill that by virtue of the deed to her mother above set forth and of the mesne conveyances whereby the complainant has become and now remains the sole owner of the estate so conveyed, she became and is entitled in fee to the way of 50 feet in width leading easterly from Ochre Point Avenue to her estate, or at least, if not in fee, to an absolute and exclusive right of way which the said Lawrence and his successors in title have no right to use in any way, leaving only a naked fee without any right of use or enjoyment in Lawrence and his successors.

The complainant further alleges in her bill that the defendant has and maintains upon her premises a garage for the care and storage of four or more automobiles adjacent to the south side of the way and opening thereon and within a few feet of the complainant's entrance to her estate; that in front of the garage and across the sidewalk which the complainant has a right to use as an entrance on foot to her estate the defendant has removed the grass which formerly covered this sidewalk and has placed there a quantity of rough broken stone which is not convenient or safe for the complainant or her family or guests to walk upon; and that upon and across said sidewalk in front of said garage, and across said sidewalk leading into said complainant's gate the defendant by her servants and chauffeurs is accustomed to leave automobiles standing and there to wash, dust, and clean them and to have them repaired and that said machines drip oil on said sidewalk; that the water from the washing of said machines runs down upon and across said sidewalk; and that all these acts and doings of the defendant and her servants, for long periods of time during the years 1911, 1912 and 1913, up to the date of filing the bill, have resulted in converting the way in front of the complainant's entrance to her estate into a garage yard to the serious inconvenience and obstruction of the complainant in her use of the way; that said way is further seriously obstructed by the said automobiles by the frequent entrance and exit of said machines into and out of said garage across said sidewalk and in front of the main entrance to said complainant's estate requiring the frequent backing of said machines across the entire width of the traveled way in front of the main entrance gate of said complainant; and that the headlights of said automobiles shine into her grounds and house upon approaching said garage and turning for the purpose of backing in, to her great annoyance.

The bill further complains that the defendant maintains and uses a tank for holding gasoline for the use of said automobiles under said south sidewalk in front of said garage and

that the same has a spout or pipe through which said tank is filled projecting upwards through the ground near the middle of said sidewalk about 8 or 9 inches, and that said pipe or spout is about two inches in diameter, and is a serious and dangerous obstruction in said walk over which pedestrians are liable to stumble or ladies may catch their skirts; that said tank is filled from a large vehicle or tank-car which, when said tank is being filled, is accustomed to stand upon and across said walk for a considerable time to the serious obstruction of said way.

The bill further complains that the defendant has and uses a service entrance to her estate, about 13 feet wide across the south sidewalk of the way, into and out of which a larger number of service wagons and automobiles frequently go and come carrying to the defendant's large estate all of the supplies required therefor, and this is a serious obstruction to the complainant and her family and guests in the use of the south sidewalk, which is the only convenient entrance by foot passengers into complainant's estate; that one of the predecessors in title of the defendant constructed and the defendant now uses in front of the potting-shed of the defendant's green houses a roadway across and upon said south sidewalk for the convenience of said potting-shed and green house for a distance of some sixty to ninety feet, said roadway being of crushed stone somewhat lower than the level of the grass on the sidewalk, and that this roadway is constantly in use for the purposes of the business of said potting-shed and greenhouses by wagons and other vehicles coming and going and standing thereon for the receipt and delivery of flowers and fruit, for the delivery of large quantities of coal to said greenhouses and for the taking away of ashes therefrom, to the serious interference with the use of said sidewalk by the complainant. The bill further complains that the swill from defendant's large estate is taken out through said service entrance and over said way; that horses from defendant's stable are exercised on said way by men half clothed; that the manure from the stable in rear of said garage is

thrown out upon a triangle of land lying between said stable and the land of the complainant and lies there during the day, and in the morning is carted away, the carts removing the same going out in front of her main entrance, all to the serious discomfort, inconvenience and danger of the complainant.

The bill claims that by reason of these interferences in the use of said way complainant's estate has been damaged as to its rental value $1,000 per year, and as to its fee value in the sum of $20,000.

The bill prays for an injunction restraining the defendant, her agents and servants from obstructing said way and from interfering with the free use of said way by complainant and requiring the closing of the said openings into said way and the removal of said gasoline tank and outlet.

The defendant filed an answer admitting the execution of deeds, but denying the complainant's claims to the ownership of the fee in the way, or of an exclusive right of way; denying also the obstruction and damage alleged; and claiming that by virtue of the deeds already set forth the defendant became the owner of the fee in the land covered by the continuation of LeRoy Avenue, subject only to an easement for a right of way in the said complainant. The answer further alleges that the way over which the complainant has her right of way is only forty feet in width; and further alleges by way of cross-bill that the defendant and her ancestors in title have placed a row of trees on the north side of the way about eight feet from the Kernochan line, and a row of trees on the south side of the way, part of which are fir trees and the rest are maple trees, all which trees have been planted and growing for more than twenty-five years; that said trees are beautiful shade trees such as are usual on streets and avenues in that vicinity and are valuable assets of the estate of the defendant and in no way interfere with or obstruct or affect the right of passage of the complainant; that in August, 1913, and again in September, 1913, the complainant by her agents and employees without the knowledge or consent of

the defendant cut down branches of said fir trees and said
maple trees; that the complainant at other times has driven
upon the grass upon the sides of said way and otherwise
damaged and mutilated the same and is continuously from
time to time doing damage to the roadway, trees, shrubbery
and other things on said way that do not interfere with her
right of passage; and that the complainant has threatened
and now threatens to cut down other trees and to do other
injury to the said property of the defendant; the defendant
prays for answer to the allegations of the cross-bill and that
the complainant may be enjoined from further cutting trees
or otherwise injuring the property of the defendant.

The complainant by her answer to the cross-bill denies the
allegations of the answer regarding the width of the way, and
reasserts her claim that the width thereof as provided for by
said Lawrence was fifty feet, and not forty feet; she denies
all the allegations regarding the cutting of trees and other
injuries.

The cause being at issue on the pleadings was referred to a
master to frame issues of fact, on July 6, 1914, and the
master thereupon framed issues of fact and reported the
same to the court as follows:

1.   Is the fee of the strip of land or way extending easterly
from Ochre Point Avenue to land of the complainant, and
more fully described in the bill and answer, in the complain-
ant or in the respondent?

2.   If the fee of said strip of land or way is not in the
complainant, what is the character and nature of her interest,
if any, in and to the aforesaid strip of land or way?

3.   What is the width of said strip of land or way?

4.   What use was made of said strip of land or way by
William Beach Lawrence and by the Pendletons, after the
conveyance by said Lawrence to Alice Key Pendleton of the
Pendleton estate?

5.   If the complainant has any interest or right of way in
said strip of land, are the acts of the respondent and her use
of said strip or way, as set out in the bill and answer, an

obstruction or interference with the said right of way of said complainant, and her use and enjoyment thereof ?

6.    Is the use of said strip of land or way by the respondent as set out in the bill and answer, necessary to the respondent's use of her estate ?

7.    Has the complainant injured the trees, grass and shrubbery in the said strip of land or way, as is set out in the respondent's cross-bill ?

Upon careful consideration of all the evidence before the court, we find no ground for holding that said Lawrence ever intended to convey or did in fact convey the fee in the (1) strip of land or way extending easterly from Ochre Point Avenue to land of the complainant conveyed to Mrs. Pendleton by his deed to her of November 28, 1876.    It is plain from the consideration of the language of the deed above quoted that he conveyed a strip of land exactly one hundred feet wide, beginning at the sea "bounded northerly on the lands of said Mary S. Kernochan, there measuring about three hundred and ninety (390) feet, to a point two feet easterly of the east line of the carriageway of the grantor, westerly on the end of a continuation of Le Roy Avenue and fifty feet on lands of the grantor"   .   .   . "with the free right of passage to the same out to LeRoy Avenue, with carriages, teams, and otherwise at any and at all times."    Substantially the same language in all essentials was used in the subsequent deeds above referred to whereby the interests of the complainant's brother and sister were conveyed to the complainant in 1908.    The first point in this description to be specially noticed is that the westerly boundary begins on the north at the Kernochan line at a point "two feet easterly of the east line of the carriageway of the grantor."   .   .   .    This expressly recognizes the fact that there was a "carriageway of the grantor" at this point coming in easterly over the north portion of the grantor's land and turning southerly two feet west of the Pendleton line and running down into the other land of the grantor.    It is plain evidence also of an intention of the

grantor to retain the use of such carriageway on his own land, and express notice to the grantee of the existence of such carriageway and of the grantor's intention to retain and use it, since there is nothing in the deed to show that the grantor intended to surrender it. Furthermore, if necessary, the existence of this "carriageway of the grantor" is further shown and corroborated by certain plats and the field notes thereof exhibited in evidence whereon the location of this way is plainly shown at about the distance from the Pendleton line called for by the deed. These surveys and plats were made in 1881 at the time when Catherine L. Wolfe was preparing to lay out the Lawrence estate which she had then recently purchased. Mrs. Abney attempts to say in her evidence that Governor Lawrence never used this carriageway after her father bought his estate, although she admits that at and prior to the time when her mother purchased there were wheel tracks turning south from the road or way near the Pendleton estate into the Lawrence estate toward the Lawrence residence. But it must be remembered that Mrs. Abney, then Miss Pendleton, was only at the Pendleton estate for a portion of the year during the years 1877–1881; that the property was rented in 1880, and the Pendleton family did not occupy it regularly for many years thereafter; and that Mrs. Abney only occasionally saw it until after she became the purchaser of the other interests in 1908. She could not therefore have known what use, if any, Governor Lawrence made of his "carriageway" from 1876 to the time of his death, and her testimony amounts only to proof that she did not see him or his servants use it during the limited periods which she spent on the property. There is other evidence on the part of the respondent to show that Lawrence's employees did use this way into his estate, and that after Lawrence's death his successors in title always freely used the Pendleton road as a way into the Lawrence property; that all sorts of materials, for the reconstruction of the Wolfe place were carried in over this road; that Lorillard used it freely, and that it has always

been. freely used by everybody since as an approach to the rear of the Twombly estate; and there is no evidence that anyone ever protested against such uses until after the present complainant bought in 1908; nor does it appear that the complainant protested against any of the uses made by the Twomblys after Mr. Twombly purchased the estate in March, 1896, except by some complaints made to the Twombly servants, until October, 1911, when she sent a letter to Mrs. Twombly dated October 19, 1911, in which she made no complaint of any of the uses for or in connection with the garage or gasoline tank or the greenhouses and potting-shed, or anything except the location of certain fir trees near Ochre Point Avenue which had been planted by Mr. Lorillard, as she says, the branches of which had been allowed to grow so near the ground across the south sidewalk and over the edge of the carriage road as to be an obstruction to the sidewalk and carriage road, and to cut off the rays of the street light located at the corner of Ochre Point Avenue from the sidewalk; and further complained of the extension of the grass, where these trees were, toward the centre of the way narrowing the way so that carriages and autos could not turn; also complaining of white stones placed on the edge of the grass, etc. (which do not now appear to be there; none are shown in the photographs or mentioned in the bill). (It may be here noted that the fir trees of which Mrs. Abney complained are the same trees from which she caused the branches to be cut off in August and September, 1913.)

We think it is a fair conclusion from all of the testimony that the Pendleton way has always, since the date of the deed from Lawrence to Mrs. Pendleton, November 28, 1876, been used both by Lawrence and his successors in title as owners of the fee as a way of access to the rest of the Lawrence estate at any time and from time to time as they saw fit, and that there is no ground for the claim that Lawrence ceased to use it from 1876 when Pendleton took possession down to the date of Lawrence's death; and that no one on behalf of the owners of the Pendleton estate ever protested against such

use until the complainant did so in or about the year 1911. It may further be noticed that the evidence shows that Lawrence had been endeavoring for many years to sell other portions of his land southerly of the Pendleton estate and fronting on the sea and there is some evidence that he used this "carriageway" over the north portion of this land as a convenient way of access to his land on the ocean shore south of the Pendleton estate. At any rate there is nothing in the deed to warrant us in saying that he did not intend to retain the fee of the portion of his estate over which the Pendleton road and his "carriageway" passed and to use it for purposes of access to his other land.

The second point in this description to be specially noticed is that the land is bounded "westerly on the end of a continuation of Le Roy Avenue and fifty feet on lands of the grantor; then easterly in a line parallel with and one hundred feet distant from the southerly line of the lands of the said Kernochan to the sea." . . . It thus appears that the land conveyed was exactly one hundred feet wide southerly from the Kernochan line, and as fifty feet of that was bounded on other land of the grantor, there must have been exactly fifty feet bounded on the end of the continuation of Le Roy Avenue. At that time Le Roy Avenue was laid out 50 feet wide by adjoining owners from Bellevue Avenue easterly to what is now the location of Ochre Point Avenue, and stopped at that point. That portion of Le Roy Avenue was later sold for a highway to the City of Newport. The extension to the Pendleton estate never became a public highway. It was plainly the intention of Lawrence that the lines of Le Roy Avenue should be extended easterly of the width of fifty feet so as to reach the Pendleton estate and furnish the space within which both the Pendleton road and "the carriageway of the grantor" should run; and we think the language of the deed implies a covenant to this effect, and estops the said Lawrence and his grantees and successors in title from afterwards denying that there was such a street or way. *Teasley* v. *Stanton*, 136 Ala. 641; *Smith* v. *Lock*, 18

Mich. 56; *O'Linda* v. *Lothrop*, 21 Pick. 292; *Tufts* v. *City of Charlestown*, 2 Gray, 271; *Franklin Ins. Co.* v. *Cousens*, 127 Mass. 258.

In *Tufts* v. *City of Charlestown*, *supra*, it is said, p. 273: "The description of the way, in the deed, as a 'contemplated passage way,' shows the agreement of the parties, that there should be such a passage way, as distinctly as if it had been already laid out; and has the like effect, by way of covenant and estoppel, as a description of a way already laid out." See, also, *Hennessey* v. *Old Colony, &c., R. Co.*, 101 Mass. 540; *Fox* v. *Union Sugar Refinery*, 109 Mass. 292; *Chapin* v. *Brown*, 15 R. I. 579; *Thaxter* v. *Turner*, 17 R. I. 799; *Thomas* v. *Poole*, 7 Gray, 83; *Rodgers* v. *Parker*, 9 Gray, 445.

The boundary "westerly on the end of a continuation of Le Roy Avenue" cannot however be construed to have conveyed to Mrs. Pendleton any interest by way of fee in the soil of the "continuation," as attempted to be argued by the complainant's counsel; there is no authority cited and we know of none to the effect that a conveyance of land bounded on "the end of" a way conveys anything more than an implied right to use the way as appurtenant to the land granted. But in this case there is no room for implication of a right of way because there is an express grant of a right of way, as already quoted, in these words "with the free right of passage to the same out to Le Roy Avenue with carriages, teams and otherwise at any and at all times;" the language of the description therefore simply defines the *locus* within which this right of way is to be exercised, as being over this "continuation of Le Roy Avenue," wherein said Lawrence was using his "carriageway" as already shown, and the plain result of this construction of the language of the deed is that the fee in the "continuation" was reserved by Lawrence and that he also had and retained his "carriageway" over the same subject only to the "free right of passage" granted to Mrs. Pendleton.

The complainant attempted to show, by evidence introduced over the objection of the defendant, certain nego-

tiations and conversations, agreements and understandings had and entered into prior to the execution of the deed, between Lawrence and his agent, Smith, on the one hand, and Mr. and Mrs. Pendleton on the other, to the effect that the Pendletons should have the *exclusive* use of the way; she introduced in evidence the contract of sale and purchase, as well as evidence of conversations between the parties. The contract of sale does not materially vary from the terms of the deed except in the description of the westerly boundary as being "westerly on a continuation of Le Roy Avenue fifty feet, and on other land of said Lawrence fifty

(2) feet" . . . ; thus making a definite boundary of fifty feet on the "continuation." As we have seen above this is immaterial, because it is plain from the deed that this distance was fifty feet, and that the implied covenant in the deed was to have fifty feet in width open for the use of the grantee, subject to the use thereof by the grantor's "carriageway" mentioned in the deed to Pendleton and the subsequent conveyances to complainant. We think that all this evidence was immaterial and incompetent; the deed is in no way ambiguous on its face, and is to be construed without reference to any prior understandings or promises on the part of the grantor or his agent; and parol evidence as to such matters is not to be considered. *Segar* v. *Babcock*, 18 R. I. 203; *Wells* v. *Jackson Iron Mfg. Co.*, 47 N. H. 235, 253; *Olson* v. *Keith*, 162 Mass. 485, 491; *Uihlein* v. *Matthews*, 172 N. Y. 154, 159; 17 Cyc. 616. Many other cases might be cited, but it is not necessary. The deed speaks for itself, and as we have already seen there is no language therein which can be construed either to give the fee in the fifty foot continuation to the grantee or to grant an exclusive right of way. For some reason which does not appear, it was evidently thought by Lawrence's executors and trustees that the width of the way was to be only forty feet, although no fence had up to that time been erected to mark out or define the way; and they so described it in their deed to Catherine L. Wolfe in November, 1881. It appears that

later Miss Wolfe must have discovered this mistake, because when in 1882 she erected her north fence, being the first fence erected by anyone adjoining said "continuation," she had it placed at a distance of fifty feet south from the Kernochan line, thus recognizing the proper width of the way as called for by the Pendleton deed. Subsequently she brought suit in New York against the executors and trustees for deficiency in the land conveyed to her, which appears to have had reference to this ten foot strip of land, and recovered judgment for some amount by agreement of parties.

Thus far we have found as to the first three issues of fact set forth by the master, and above quoted:

1.   That the fee in the way is not in the complainant, but is in the respondent;

2.   That the complainant has merely a "free right of passage," etc., as above quoted over the "continuation of Le Roy Avenue;"

3.   That the width of said strip of land is fifty feet.

As to the fourth issue we have found that the said William Beach Lawrence had a "carriageway" and the right to use the same over said strip of land prior to the Pendleton deed, and that he continued to use such carriageway as he saw fit during his lifetime; and we find that the Pendletons and their tenants and the complainant have continued to use such right of way for all purposes of ingress and egress to and from their estate.

(3)   Since then it appears that the defendant as a successor in title to Lawrence has a right of way over this fifty foot continuation of Le Roy Avenue, as owner of the fee, as well as under the language of the deeds, it may be well to consider in a general way what uses the dominant and servient tenants may make of this right of way under the authorities. In 14 Cyc. p. 1208, it is said: "The owner of the servient estate may use his property in any manner and for any purpose consistent with the enjoyment of the easement. Thus in the case of a way the owner of the servient estate may use the land over which it passes in any manner which

does not materially impair or unreasonably interfere with its use as a way. He may himself use it as a way, or may permit others to do so, unless the rights of the owner of the easement are exclusive."

Says Jones on Easements: "391. The grant of a right of way over land does not pass any other right or incident. The owner of the soil retains full dominion over his land, subject merely to the right of way. He may make any use of his land which does not interfere with a reasonable use of the way. Subject to the easement granted, his control extends indefinitely upwards above the surface of the ground, and downwards beneath it *ad inferos*. He may build a bridge or other structure over the way, provided he builds so as not to materially impair the use of the easement." . . .

"392. The grant of a right of way carries only such incidents as are necessary to its reasonable enjoyment. The grantor parts with only what is adequate to the purpose of it. 'Notwithstanding such a grant, there remains with the grantor the right of full dominion and use of the land, except so far as a limitation of his right is essential to a fair enjoyment of the right of way which he has granted. It is not necessary that the grantor should expressly reserve any right which he may exercise consistently with a fair enjoyment of the grant. Such rights remain with him, because they are not granted. And, for the same reason, the exercise of any of them cannot be complained of by the grantee, who can claim no other limitation upon the rights of the grantor, but such as are expressed in the grant, or necessarily implied in the right of reasonable enjoyment.'"

In *Atkins* v. *Bordman*, 2 Metcalf, 457, it was held that the defendant had a right to erect a building over the passageway through which the dominant tenant had a right of way. Chief Justice Shaw says: "The owner of an estate in fee, by virtue of his interest and power as proprietor, may make any and all beneficial uses of it at his own pleasure, and he may alter the mode of using it, by erecting or removing buildings over it, or digging into or under it, without restraint."

. . . "If any other person has an easement in it, the owner has still all the beneficial use, which he can have consistently with the other's enjoyment of that easement. If the easement is a right of way, this consists in a right to use the surface of the soil, for the purpose of passing and repassing, and the incidental right of properly fitting the surface for that use; but the owner of the soil has all the rights and benefits of ownership consistent with such easement."

In *Burnham* v. *Nevins*, 144 Mass. 88, the owner of the servient estate erected over the passageway bay windows projecting over the way from thirteen to eighteen inches, not interfering with the street passage. The court held that injunction did not lie. The court said: "These general principles are, that a man who owns land subject to an easement, has the right to use his land in any way which is not inconsistent with the easement, but has no right to use it in a way which is inconsistent with the easement; and that the extent of the easement claimed must be determined by the true construction of the grant or reservation by which it is created, aided by any circumstances surrounding the estate and the parties which have a legitimate tendency to show the intention of the parties."

See, also, *Gerrish* v. *Shattuck*, 132 Mass. 235.

In *Grafton* v. *Moir*, 130 N. Y. 465, the court quotes with approval from Goddard on Easements, page 332, as follows: "A right of way along a private road belonging to another person does not give the dominant owner a right that the road shall be in no respect altered or the width decreased, for his right does not entitle him to the use of the whole of the road, unless the whole width of the road is necessary for his purpose, but is merely a right to pass with the convenience to which he has been accustomed; . . . and even where a right of way was granted over certain roads marked on a plan, and one was described there as forty feet wide, it was held that the grantee was entitled to only a reasonable enjoyment of a right of way, and that such

reasonable enjoyment was not interfered with by the erection of a portico which extended a short distance into the road so as to reduce it at that point to somewhat less than forty feet," citing *Clifford* v. *Hoare,* L. R. 9 C. P. 362; *Hutton* v. *Hamboro,* 2 Fost. & F. 218.

In *Maxwell* v. *McAtee,* 9 B. Monroe, 20, there was a question as to whether or not the defendant servient tenant could maintain a fence, and the court said it could. Speaking of the rights of dominant and servient tenants of a right of way, the court said: "Conceding that the agreement for the passway was in terms equivalent to a grant, and that the parol grant of a passway for five years was valid, still it is evident that the general grant of a passway, or right of way, over the land of the grantor at a particular place, does not confer either the possession or the right of possession of the land, but the mere right of way, or of passing over it. And nothing passes as incident to such a grant but that which is necessary for its reasonable and proper enjoyment (3 Kent's Com. 420); *Lyman* v. *Arnold,* 5 Mason, 195. Notwithstanding such a grant, there remains with the grantor the right of full dominion and use of the land, except so far as a limitation of his right is essential to the fair enjoyment of the right of way which he has granted. It is not necessary that the grantor should expressly reserve any right which he may exercise consistently with a fair enjoyment of the grant. Such rights remain with him, because they are not granted. And for the same reason the exercise of any of them cannot be complained of by the grantee, who can claim no other limitation upon the rights of the grantor, but such as are expressed in the grant, or necessarily implied in the right of reasonable enjoyment."

Many more cases to the same effect might be cited; but they are unnecessary; the general current of authority is all to the same effect.

The next question which arises is as to the extent of the rights to which the complainant is entitled and whether any of the uses thereof made by the defendant amount to an

unlawful obstruction or interference with the complainant's rights. The language of the grant of the right of way is "with the free right of passage to the same out to Le Roy Avenue, with carriages, teams and otherwise at any and at all times." We find this language clear and free from ambiguity. The words "free right of passage" are equivalent to the words "free right of way;" the meaning of the word "free" was construed in *Flaherty* v. *Fleming*, 58 W. Va. 669, to mean "an unobstructed right of way, so far as any future act of the owner of the servient lot is concerned;" and with this construction we have no dispute; bearing in mind, however, as we have already shown, that Lawrence and his successors retained the right to use his "carriageway;" such use of his carriageway would not be an obstruction unless he or his successors made it so by such use as would really and substantially interfere with the grantee's use. Without citing the many authorities referred to by the complainant's counsel, we think it is plain that Mrs. Pendleton had and her successor, the complainant, now has a very full and broad right to an unobstructed passage to and fro over the fifty foot way in carriages, automobiles, or other vehicles, or on horseback or on foot or in any way that they see fit to go and come either by night or day "at any and at all times." We think the language is so plain that it needs little or no further discussion.

But although we have found that Lawrence retained and the defendant now has a right of access over the way of which the defendant owns the fee, to the defendant's estate, so that both the complainant and the defendant are entitled to use the way, a consideration of the fifth issue brings us to the question whether the acts of the respondent and her use of the way as set forth in the pleadings and proofs constitute an obstruction or interference with the complainant's right of way and her use and enjoyment thereof. The evidence shows that at the time when Mrs. Pendleton bought her estate and right of way there was next south of the Kernochan line on the fifty foot strip a broad hedge or

thicket of buckthorn variously estimated as from twenty to thirty feet in width which obstructed a large portion of the width of the way and extended from the Pendleton place practically the whole length of the way to Ochre Point Avenue and turned southerly on the Lawrence property near the present corner of Ochre Point Avenue. Mrs. Pendleton built her barn near the northwest corner of her lot, eight feet southerly from the Kernochan line, and the barn was twenty-six feet wide, so that its south side was thirty-four feet from the Kernochan line; Mrs. Abney and another witness testified that the buckthorn hedge was wide enough practically to screen the stable from view as one approached the Pendleton estate from the west, and that a quarter circle was cut in this hedge so as to give access to the main door in the west end of the stable from the way. So that this hedge or thicket must have been upwards of thirty feet in width southerly from the Kernochan line, and obstructed any use of the northerly portion of the way for carriages or foot passengers. It does not appear how long this hedge was allowed to remain, but it does appear that Mr. Pendleton did not remove it, but had a roadway built to the south thereof, wide enough for two carriages to pass. At some later period this hedge was removed and a macadam roadway was built substantially as at present located, there being a grass sidewalk on the north side next to the Kernochan line about eight feet in width with a row of maple trees at the southerly edge thereof, then next southerly a macadam roadway of about twenty-five feet in width and next southerly of that another grass walk with maple and fir trees growing thereon and extending to the fence on the southerly side of said way. These trees were set out and the present roadway and sidewalks were built by some of the predecessors in title of the defendant and have been kept up and principally cared for by the defendant and her predecessors since 1881 or 1882, when Miss Wolfe bought the estate now owned by the defendant. The carriageway is in much better condition and wider than the carriageway built by the

Pendletons, the trees and grass seem from the photographs in evidence to be in good condition and the carriageway goes directly to the main entrance of Mrs. Abney's property where she erected iron gates with granite pillars sometime after she became the sole owner of the estate, so as to meet and fit said carriageway in the most convenient manner. In her letter already quoted, dated October 19, 1911, Mrs. Abney speaks of the erection of this gate; she also says: "It has been a matter of great regret to me that my place has been let go to ruin for so long a time" (referring evidently to the time the place was rented or vacant from 1880 till 1908, when she purchased her brother's and sister's interests). It appears that all the improvements made upon the "continuation of Le Roy Avenue" must have been made from time to time by the owners of the fee, and that the condition of the way is much better and much less obstructed than it ever was when the Pendletons occupied their estate from 1877 to 1881.

We think the allegations of the bill with reference to the numerous uses made by the defendant and her servants and agents and employees regarding the south sidewalk, which the complainant is entitled to use as a footway for herself, her family and guests are reasonably well supported by the testimony. While we think there is naturally some exaggeration on the part of the complainant, and some attempt on the part of the defendant's witnesses to minimize the extent of their obstructions of the way, it is fairly proved that such uses by the defendant have to an unlawful and substantial extent obstructed and interfered with the "free right of passage" . . . "at any and at all times" to which the complainant is entitled. We think it is fairly proved that since the building of the garage opening upon the way within a few feet westerly of the complainant's gateway, there has been an unreasonable and unlawful obstruction of complainant's rights due to the manner of construction of the approach to said garage over the sidewalk with rough stone unsuitable to walk upon; due also to

the manner in which the automobiles have been allowed to stand upon and over said sidewalk and to be beaten, cleaned, washed and repaired thereon or so near thereto as to cause annoyance and obstruction of passage, wetting the sidewalk with oil and water and at some times rendering the sidewalk either impassable, or causing danger to foot passengers or carriages by their frequent and rapid passage back and forth out of and into said garage in front of the gate and across the sidewalk; we think also that the maintenance of said gasoline tank with its spout or inlet two inches in diameter extending some eight inches upward from the surface is a dangerous obstruction of the way; the spout or inlet is a direct obstruction to foot passengers, the cart which delivers gasoline to the tank, standing upon and over the sidewalk while doing so is an impassable obstruction so long as it remains there; again, that gasoline is a dangerous explosive, is a matter of common knowledge, and if as testified by the plaintiff, men delivering gasoline stand about smoking while delivery is going on and when the cover is off the inlet to the tank, there is liability of explosion and serious damage to the complainant and to her free right of passage; we think the complainant is fully justified in her complaint that the portion of the sidewalk and carriageway in front of her gateway is converted into a "garage yard" during the season when the garage is in use, and that an unlawful and dangerous obstruction to her right of way is thereby created, which warrants the interposition of this court by way of an injunction requiring that all such uses of said way, by and for automobiles and gasoline wagons, shall cease; and that the spout or inlet of the gasoline tank be removed and closed, and the further use of said gasoline tank be stopped; we think also that the sidewalk in front of said garage should be levelled and smoothed up to the level of the rest of said sidewalk, so as to make the same safe and convenient for foot passengers. It is apparent to us that in no other way can the rights of the complainant be adequately protected. With regard to the carting of manure by defendant's

servants from the stable opening near complainant's
gateway to and along said way, we think the evidence does
not show such a substantial interference with or obstruction
of the complainant's right of free passage as to warrant an
injunction.  It appears that such cartage only takes place
once a day in the early morning, and that the amount
removed at any one time is comparatively small.

The same may be said as to the use of the right of way
by the defendant in connection with the greenhouses and
potting shed.  It is a substantial and unlawful interference
with the complainant's free right of passage over the south
sidewalk, that coal teams delivering coal and ash teams
removing ashes and numerous other vehicles doing business
with the greenhouses should be allowed to stand upon and
obstruct any portion of said south sidewalk.  There is
ample space within the defendant's grounds for such coal
and ash teams and other vehicles to stand while doing this
necessary business, and the most that said teams and
vehicles are entitled to do by way of use of said right of
way is to pass and repass upon the same into and out of the
service entrance; and the defendant, her servants, employees
and agents should be enjoined from allowing such teams and
vehicles to stand upon the sidewalk; also the defendant
should be enjoined from maintaining the roadway over the
sidewalk in front of the potting shed now and formerly
used by said teams and vehicles doing business with said
greenhouses or said potting shed, and that said sidewalk
where said roadway now is should be restored to the level
of the rest of said sidewalk so as to be fit, safe and convenient
for foot passengers.

As to the use of the service way across the sidewalk by
the large number of supply teams and other vehicles which go
back and forth over the way and into the defendant's estate
we are of the opinion that the complainant has no just
ground for complaint.  The defendant is entitled to the
use of a carriageway as owner of the fee under the plain
terms of the deed from Lawrence to Mrs. Pendleton as we

have above shown; the mere fact that a considerable number of service vehicles pass and repass in this service into the defendant's estate is not of vital consequence and it is not shown that such vehicles have caused any substantial obstruction of the complainant's rights. · The same may be said as to the exercising of horses by leading them along the way; it appears that the stablemen are decently clad in their working clothes when so acting in leading horses; and it does not appear that such acts are so frequent or of such long continuance as substantially to interfere with complainant's rights.

Complaint is also made as to the removal of swill from defendant's estate; but it appears from the evidence that such swill is removed by the city authorities in their own carts, and that the same cart removes both the complainant's and defendant's garbage. These carts are not under the control of the defendant, but appear to be operated by the health department of the city; if any complaint is warranted as to the action of the drivers thereof it should be addressed to the proper authorities of the city.

There appear in the evidence some complaints that the grass and trees on the way are an obstruction and unduly narrow the way, preventing the easy and convenient turning of vehicles, and especially of automobiles. We do not find any such allegations of the bill relating to trees and grass, nor do we find from the evidence any reason to say that they are an unlawful or substantial obstruction. They have been as they now are for more than twenty-five years, without complaint on the part of anyone (except the complaint by Mrs. Abney as to the branches of the fir trees above referred to, which she caused to be removed). They are the property of the defendant as the owner of the fee, and add much to the beauty of the way as appears by the photographs. It is so much the custom to have shade trees on driveways, both public and private, and also to have grass borders to such driveways and the custom has been so much encouraged by public authorities and by private enterprise, that we

cannot say that such trees and grass are an interference with a way unless they manifestly obstruct it. No relief in this respect is prayed for by the bill in terms, nor do we find that in fact such trees and grass as now located and maintained, work any substantial obstruction to the complainant's rights, if she is entitled to raise this point under her prayer for general relief.

Some attempt is made in the evidence to show that the grade of the way has been changed so as to throw surface water toward and upon the complainant's estate to her damage. There are no allegations in the bill relating to this matter; nor is there any substantial evidence to show that the grade of the way does not follow the natural slope of the land. We can grant no relief in this respect.

Something has also been said in the evidence about boulders placed along the edge of the driveway. The bill says nothing about this, nor do any such boulders now appear on the ground as shown by the photographs.

In regard to the sixth issue, it is manifest that the use of said way, while not absolutely necessary to said respondent, in the sense that she could not use her property at all without it, is under the circumstances of great convenience. But the matter of absolute legal necessity is immaterial, since, as we have shown, the respondent is the owner of the fee, and under the deeds as we have construed them, the respondent has a legal right to the use of the way, so long as she does not unlawfully obstruct or interfere with the rights of the complainant.

Complainant claims that her estate, by reason of the use of the way and the interference with her rights on the part of the defendant, has been damaged to the extent of $1,000 a year in rental value, and $20,000 in fee value. This is a mere estimate and has no substantial support from the testimony. No doubt there may have been some legal damage to her estate from the obstructions herein enumerated and which we have said should be enjoined. But Mrs. Abney in her letter to Mrs. Twombly October 19, 1911, says:

"It has been a matter of great regret to me that my place has been let go to ruin for so long a time;" and it is manifest that any depreciation of rental value or fee value which may have occurred has been largely the result of this neglect, in the long period from 1881 to 1908, when the property was either rented or vacant.

The seventh issue states the question whether the complainant "injured the trees, grass and shrubbery on the strip of land or way, as is set out in the respondent's cross-bill?" It is in evidence that at some time in July, 1913, very early in the morning, the complainant with two men under her direction went out to a point near the corner of the way and Ochre Point Avenue, on the south sidewalk of the way and caused the branches of certain fir trees growing upon and over said south sidewalk to be cut off and trimmed up so as not to obstruct the way or shut off from the way the rays of light from the street lamp located upon the corner. Her reason for this, as she says, was that these branches obstructed the passage over the sidewalk, as well as the southerly side of the carriageway and also prevented the street light from shining upon said walk and carriageway and towards her entrance gate. It does not appear either from the photographs or the other evidence that any damage was done to said trees or that they were not in fact benefited by such trimming; nor does it appear that any substantial damage was done to grass or shrubbery, or that any threats of interference therewith have been made by the complainant. We think the matter referred to was not of such serious importance as to warrant an injunction. If the complainant has interfered or sees fit to interfere with the property rights of the defendant in regard to grass, trees or shrubbery, we think the defendant has an ample remedy at law.

Counsel for both parties have cited many authorities all of which have been carefully examined. Many of them were cited on behalf of the complainant in the endeavor to sustain her extreme claims as to ownership of the fee in the way, or at least, as to an exclusive right of way. It is

sufficient to say as to those cases, that they do not support such claims in view of what we regard as the plain and obvious construction of the deeds. As to the rest we have found the principles of law so plain as applied to the rights of the parties that extensive citation of cases has not seemed necessary.

The parties may at their convenience present a decree for our consideration, in accordance with this opinion, for transmission to and entry in the Superior Court for the County of Newport.

*Burdick & MacLeod,* for complainant.
*Sheffield & Harvey,* for respondent.